UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

CATHY O'BRIEN,                        :
                                      :
                 Plaintiff,           :        Case No.: _____
                                      :
        -against-                     :        **COMPLAINT**
                                      :
                                      :        **DEMAND FOR JURY TRIAL**
TABLEAU SOFTWARE, INC., CHRISTIAN     :
CHABOT, ADAM SELIPSKY, WILLIAM P.     :
BOSWORTH, DR. PATRICK HANRAHAN,       :
ELLIOTT H. JURGENSEN, JR., HILARIE    :
KOPLOW-MCADAMS, GERRI MARTIN-         :
FLICKINGER, JOHN MCADAM, BROOKE       :
SEAWELL, and DR. CHRISTOPHER          :
STOLTE,                               :
                                      :
                 Defendants.          :

------------------------------------ X

        Plaintiff Cathy O'Brien ("Plaintiff"), by and through her attorneys, alleges the following

upon information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal

knowledge:

## NATURE OF THE ACTION

        1.      This is an action brought by Plaintiff against Tableau Software, Inc. ("Tableau" or

the "Company") and the members of the Company's board of directors (collectively referred to as

the "Board" or the "Individual Defendants" and, together with Tableau, the "Defendants") for their

violations of Sections 14(d), 14(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. §§ 78n(d), 78n(e), and 78t(a), respectively, and United States Securities and

Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9 ("Rule 14d-9"). Plaintiff's

claims arise in connection with the tender offer ("Tender Offer") by salesforce.com, inc.

("Salesforce"), to acquire all of the issued and outstanding shares of Tableau (the "Proposed Merger").

2.       On June 9, 2019, Tableau entered into an agreement and plan of merger (the "Merger Agreement"), whereby shareholders of Tableau common stock will receive 1.103 shares of Salesforce common stock in exchange for each share of Tableau stock they own (the "Merger Consideration").

3.       On July 3, 2019, in order to convince Tableau shareholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the Securities and Exchange Commission ("SEC"). In particular, the Recommendation Statement contains materially incomplete and misleading information concerning: (i) the Company's financial projections; and (ii) the valuation analyses performed by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs").

4.       The Tender Offer is scheduled to expire at midnight, Eastern Time, at the end of July 31, 2019 (the "Expiration Date"). It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's shareholders prior to the forthcoming Expiration Date so they may make an informed decision on whether to tender their shares.

5.       For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Merger, until the material information discussed below is disclosed to Tableau shareholders or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(d), 14(e), and 20(a) of the Exchange Act.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id*. at 1316.

8.      Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Tableau common stock trades on the New York Stock Exchange, which is headquartered in this District, and the Defendants retained as a financial advisor Goldman Sachs, which is also headquartered in this District, rendering venue in this District appropriate.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

9.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Tableau common stock.

10.     Defendant Tableau is a Delaware corporation and maintains its principal executive office at 1621 North 34th Street, Seattle, Washington 98103. Tableau is a software company specializing in data analysis. The Company's common stock traded on the NYSE under the ticker symbol "DATA".

11.     Individual Defendant Christian Chabot is a director of Tableau and is the Chairman of the Board.

12.     Individual Defendant Adam Selipsky is a director of Tableau and is the President and Chief Executive Officer of the Company.

13.     Individual Defendant William P. Bosworth is, and has been at all relevant times, a director of the Company.

14.     Individual Defendant Dr. Patrick Hanrahan is, and has been at all relevant times, a director of the Company.

15.     Individual Defendant Elliott H. Jurgensen, Jr. is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Hilarie Koplow-Mcadams is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Gerri Martin-Flickinger is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant John McAdam is, and has been at all relevant times, a director of the Company.

4

19.     Individual Defendant Brooke Seawell is, and has been at all relevant times, a director of the Company.

20.     Individual Defendant Dr. Christopher Stolte is, and has been at all relevant times, a director of the Company.

21.     The defendants identified in paragraphs 10-20 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.      Background of the Company and the Tender Offer**

22.     Tableau, incorporated on July 19, 2004, offers software products. The Company's products are used by people of skill levels across all kinds of organizations. Its technologies include visual query language (VizQL), which translates drag-and-drop actions into data queries and then expresses that information visually, and Hybrid Data Architecture, which combines the power of Live Query and In-Memory Data Engines. VizQL unifies the formerly disparate tasks of query and visualization and allows users to transform questions into pictures without the need for software scripts, chart wizards or dialogue boxes. Live Query Engine allows users to connect to volumes of data in its existing format and location. In-Memory Data Engine enables users to import amounts of data into its own in-memory database. Tableau currently offers five key products: Tableau Desktop, a self-service, powerful analytics product for anyone with data; Tableau Server, a business intelligence platform for organizations; Tableau Online, a hosted software-as-a-service ("SaaS") version of Tableau Server; Tableau Prep, a data preparation product for combining, shaping and cleaning data; and Tableau Public, a free cloud-based platform for analyzing and sharing public data.

23.     Salesforce, incorporated February 3, 1999, is a provider of enterprise software,

delivered through the cloud, with a focus on customer relationship management (CRM). The company focuses on cloud, mobile, social, Internet of Things (IoT) and artificial intelligence technologies. The company's service offerings are configured and integrated with other platforms and enterprise applications. The company delivers its service offerings via Internet browsers and on mobile devices. Its Customer Success Platform is a portfolio of service offerings providing sales force automation, customer service and support, marketing automation, digital commerce, community management, analytics, application development, IoT integration, collaborative productivity tools, and its professional cloud services.

24.     On June 10, 2019, Tableau and Salesforce issued a joint press release announcing the Proposed Merger. The press release stated in relevant part:

### Salesforce Signs Definitive Agreement to Acquire Tableau

**World's #1 CRM and #1 analytics platform come together to supercharge customers' digital transformations**

**Combination to accelerate Salesforce's opportunity in the $1.8 trillion digital transformation space**

**Customers will be able to unlock even greater value from their data to drive smarter business decisions and more intelligent customer experiences**

**Tableau will be positioned to further its mission to help the world see and understand data**

SAN FRANCISCO, Calif. and SEATTLE, Wash. — June 10, 2019 -- Salesforce (NYSE:CRM), the global leader in CRM, and Tableau Software (NYSE: DATA), the leading analytics platform, have entered into a definitive agreement under which Salesforce will acquire Tableau in an all-stock transaction, pursuant to which each share of Tableau Class A and Class B common stock will be exchanged for 1.103 shares of Salesforce common stock, representing an enterprise value of $15.7 billion (net of cash), based on the trailing 3-day volume weighted average price of Salesforce's shares as of June 7, 2019.

**Comments on the news**

"We are bringing together the world's #1 CRM with the #1 analytics platform.

Tableau helps people see and understand data, and Salesforce helps people engage and understand customers. It's truly the best of both worlds for our customers--bringing together two critical platforms that every customer needs to understand their world," said Marc Benioff, Chairman and co-CEO, Salesforce. "I'm thrilled to welcome Adam and his team to Salesforce."

"Salesforce's incredible success has always been based on anticipating the needs of our customers and providing them the solutions they need to grow their businesses," said Keith Block, co-CEO, Salesforce. "Data is the foundation of every digital transformation, and the addition of Tableau will accelerate our ability to deliver customer success by enabling a truly unified and powerful view across all of a customer's data."

"Joining forces with Salesforce will enhance our ability to help people everywhere see and understand data," said Adam Selipsky, President and CEO of Tableau. "As part of the world's #1 CRM company, Tableau's intuitive and powerful analytics will enable millions more people to discover actionable insights across their entire organizations. I'm delighted that our companies share very similar cultures and a relentless focus on customer success. I look forward to working together in support of our customers and communities."

**Combination to Supercharge Digital Transformation**

With Tableau, Salesforce will play an even greater role in driving digital transformation, enabling companies around the world to tap into data across their entire business and surface deeper insights to make smarter decisions, drive intelligent, connected customer experiences and accelerate innovation.

Companies of every size and industry are transforming how they do business in the digital age—customers and data are at the heart of those transformations. This creates an incredible opportunity for Salesforce and Tableau, as IDC projects worldwide spending on technologies and services that will enable digital transformation to reach $1.8 trillion in 2022.1

With Customer 360, only Salesforce can provide companies with a complete, intelligent view of their customers across every touchpoint—sales, service, marketing, commerce and more. Salesforce pioneered AI for CRM with Salesforce Einstein, and today delivers AI-powered analytics for sales and marketing.

With Tableau and Einstein together, Salesforce will deliver the most intelligent and intuitive analytics and visualization platform for every department and every user at any company. Tableau will make both Customer 360 and Salesforce's analytics capabilities stronger than ever, and enable the company to reach a much broader set of customers and users.

**Tableau to Scale and Further Its Mission as Part of Salesforce**

Tableau pioneered self-service analytics with an intuitive analytics platform that empowers people of any skill level to work with data. More than 86,000 organizations around the world, such as Charles Schwab, Verizon, Schneider Electric, Southwest and Netflix, rely on Tableau to help them see and understand data.

As part of Salesforce, Tableau will be positioned to scale and further its mission to help people see and understand data. Following the acquisition close, Tableau will operate independently under the Tableau brand, driving forward a continued focus on its mission, customers and community. As part of the world's #1 CRM company, Tableau will remain headquartered in Seattle, Wash. and will continue to be led by CEO Adam Selipsky and the current leadership team.

A Shared Commitment to Empowering Communities

Salesforce and Tableau share a deep commitment to empowering their communities, enabling people of every skill level to transform their businesses, their careers, and their lives through technology. Salesforce has a growing community of more than 1.4 million Trailblazers, and the Tableau Community consists of more than 1 million passionate data enthusiasts.Together, the two communities will represent the largest group of digital business experts in the world—millions of people understanding and transforming the world through data.

**Details Regarding the Proposed Tableau Acquisition**

Salesforce and Tableau have entered into a definitive agreement under which Salesforce will acquire Tableau in an all-stock transaction, pursuant to which each share of Tableau Class A and Class B common stock will be exchanged for 1.103 shares of Salesforce common stock, representing an enterprise value of $15.7 billion (net of cash), based on the trailing 3-day volume weighted average price of Salesforce's shares as of June 7, 2019. The transaction is intended to be tax free for Tableau stockholders (except with respect to cash for fractional shares).

The transaction has been approved by the boards of directors of both companies.

Under the terms of the transaction, Salesforce will commence an exchange offer to acquire all of the outstanding shares of Tableau. The acquisition of Tableau is expected to be completed during Salesforce's fiscal third quarter ending October 31, 2019, subject to customary closing conditions, including the tender by Tableau stockholders of shares representing a majority of the Tableau common stock voting power, assuming all shares tendered or converted will be counted on a one-vote-per-share basis, and the receipt of regulatory approvals. Christian Chabot, Patrick Hanrahan and Christopher Stolte, the founders of Tableau, have all entered into an agreement with Salesforce in connection with the transaction, and have indicated that they intend to tender all of their shares in the exchange offer.

**Financial Impact to Salesforce of the Proposed Tableau Acquisition**

FY20 Revenue: The transaction is expected to increase Salesforce's FY20 total revenue by approximately $350 million to $400 million. This estimate reflects a fair value adjustment to reduce unearned revenue and unbilled unearned revenue by approximately 30%, adjustments related to the combined customer base, and inter-company revenue elimination, as required by U.S. GAAP. FY20 Revenue is now expected to be $16.45 billion to $16.65 billion, an increase of 24% to 25% year-over-year.

FY20 non-GAAP operating margin: The transaction is expected to decrease Salesforce's FY20 non-GAAP operating margin by approximately (75) basis points year-over-year.

FY20 non-GAAP EPS: As discussed further below, guidance updates for GAAP EPS for all periods discussed are not currently available and Salesforce expects to provide the applicable updates when the transaction has closed and the purchase accounting has been completed. The acquisition is expected to decrease FY20 non-GAAP diluted EPS by approximately ($0.37) to ($0.39). FY20 Non-GAAP EPS is now expected to be $2.51 to $2.53. This estimate assumes fully diluted share count of approximately 900 million, and a non-GAAP tax rate of 22.5%.

FY20 Operating Cash Flow: Operating Cash Flow is now expected to be in the range of 21% to 22% year-over-year.

These estimates assume a close date on or about October 1, 2019, and certain assumptions related to non-GAAP tax rates. Actual results could differ materially based on the actual transaction close date. Salesforce is not currently able to prepare an accurate forecast for the full year impact of the acquisition on GAAP EPS and will not be able to do so until the purchase accounting is concluded after the transaction closes. The impact on GAAP EPS is expected to be more significant than for non-GAAP EPS due to the additional stock-based compensation charges and the impact of other various non-cash items, including amortization of acquisition-related intangibles and income tax adjustments.

Non-GAAP Financial Measures: This press release includes information about non-GAAP operating margin, non-GAAP EPS and non-GAAP tax rates (collectively the "non-GAAP financial measures"). The primary purpose of using non-GAAP financial measures is to provide supplemental information that may prove useful to investors who wish to consider the impact of certain non-cash or non-recurring items on the company's operating performance and to enable investors to evaluate the company's results in the same way management does. Non-GAAP operating margin and non-GAAP EPS estimates exclude the impact of the following non-cash items: stock-based compensation, amortization of acquisition-related intangibles, as well as income tax adjustments. The non-GAAP tax rate estimate excludes the tax adjustments and tax consequences associated with the above excluded non-cash expense items. The method used to produce non-

GAAP financial measures is not computed according to U.S. generally accepted accounting principles and may differ from the methods used by other companies. Non-GAAP financial measures are not meant to be considered in isolation or as a substitute for comparable GAAP measures and should be read only in conjunction with the company's consolidated financial statements prepared in accordance with GAAP.

25.     The Merger Consideration is inadequate consideration for Tableau shareholders and does not reflect fair value for the Company. Further, the Recommendation Statement concedes that the Company's executive officers and the members of the Board have interests in the Proposed Merger "that are different from, or in addition to, the interests of the Tableau stockholders generally." Recommendation Statement at 3-4. These interests include, but are not limited to, lucrative golden parachute compensation, continued employment with the post-close entity, and the vesting of restricted stock units and options that would result from the consummation of the Proposed Merger. It is therefore imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Recommendation Statement, which is necessary for shareholders to make an informed decision on whether to tender their shares in the Tender Offer.

## II.     The Recommendation Statement Is Materially Incomplete and Misleading

26.     On July 3, 2019, Defendants filed a materially incomplete and misleading Recommendation Statement with the SEC.  The Individual Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Recommendation Statement misrepresents or omits material information that is necessary for Tableau shareholders to make an informed decision concerning whether to tender their shares, in violation of Sections 14(d), 14(e), and 20(a) of the Exchange Act and Rule 14d-9.

The Misleadingly Incomplete Financial Projections

27.     First, the Recommendation Statement entirely omits the financial projections for the pro forma combined entity (the "Pro Forma Projections"). In connection with rendering their fairness opinion and performing its underlying financial analyses, Goldman Sachs reviewed "forecasts for Salesforce pro forma for the transactions, in each case, as prepared by the management of Tableau and approved for Goldman Sachs' use by Tableau.'" Recommendation Statement at 35. Additionally, on pages 58-59 of the Recommendation Statement, the Board listed the "material" factors and benefits for recommending Tableau shareholders consent to the Proposed Merger, including the following:

> The fact that the transaction consideration to be paid to the Tableau stockholders would be in the form of shares of Salesforce common stock, and, as such, would offer the Tableau stockholders the ability (i) to participate in the future growth of Salesforce and, indirectly, Tableau, including any potential appreciation that may be reflected in the value of the combined company (including any resulting synergies), and (ii) to attain liquidity should any such Tableau stockholder choose not to retain its shares of Salesforce common stock.

Recommendation Statement at 27.

28.     The Pro Forma Projections served as a primary reason for the Board to approve and recommend the Proposed Merger and for Goldman Sachs to find the Merger Consideration "fair" to Tableau shareholders. The Pro Forma Projections are plainly material and speak squarely to the question that the Company's shareholders must answer in determining whether to consent to the Proposed Merger: is a smaller stake in the combined company more or less valuable than a full stake in the standalone company? Without the Pro Forma Projections, Defendants present the Company's shareholders with only a fraction of the equation, rendering them unable to answer this question and assess the fairness of the Proposed Merger.

29.     Second, the Recommendation Statement omits critical financial projections,

including Tableau's net income projections (the "Net Income Projections"). Defendants elected to summarize the projections for Tableau in the Recommendation Statement but they excised and failed to disclose the Net Income Projections despite the fact that the included multiple EBIT figures which were based directly on net income. This means that the Net Income Projections were readily available but inexplicably excluded from the Recommendation Statement.

30.     Therefore, by disclosing the EBIT figures in the Recommendation Statement and withholding the Net Income Projections, Defendants render the tables of projections on pages 32-33 of the Recommendation Statement materially incomplete and provide a misleading valuation picture of Tableau.  Simply put, net income projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

31.     Unlike poker where a player must conceal his unexposed cards, the object of a solicitation/recommendation statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a recommendation statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections relied upon by Goldman Sachs and the Board, but have omitted the Pro Forma Projections and the Net Income Projections. Thus, their omission renders the projections disclosed on pages 32-33 and the summary of the Board's *Reasons for the Offer and the Merger* included in the Recommendation Statement misleading.

The Misleadingly Incomplete Summary of Goldman Sachs' Fairness Opinion

32.     Second, Recommendation Statement describes Goldman Sachs' fairness opinion and the various valuation analyses performed in support of its opinion.  Defendants concede the materiality of this information in citing Goldman Sachs' fairness opinion among the "material factors that, in the view of the Tableau Board, weighed in favor of the transactions". Recommendation Statement at 27. However, the summary of Goldman Sachs' fairness opinion and analyses provided in the Recommendation Statement fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Tableau's shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, *if any*, to place on Goldman Sachs' fairness opinion in determining whether to consent to the Proposed Merger. This omitted information, if disclosed, would significantly alter the total mix of information available to Tableau's shareholders.

33.     In summarizing the Discounted Cash Flow Analysis prepared by Goldman Sachs, the Recommendation Statement fails to disclose the following key information used in their analysis: (i) the actual inputs and assumptions underlying the calculation of the discount rate range of 8.0% to 10.0% (including the values of the WACC and CAPM components); (ii) the inputs and assumptions underlying the perpetuity growth rate range of 2.5% to 4.5% used to calculate the terminal values; (iii) the actual terminal values calculated for each analysis; and (iv) the amount of net cash used to adjust Tableau's enterprise value.

34.     These key inputs are material to Tableau shareholders, and their omission renders the summary of the Discounted Cash Flow Analysis incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions,

in a discounted cash flow analysis a banker takes management's forecasts, and then makes several

key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff,

Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate

discount rate, and the terminal value…" Id.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can
> markedly affect the discounted cash flow value. For example, a change in the
> discount rate by one percent on a stream of cash flows in the billions of dollars can
> change the discounted cash flow value by tens if not hundreds of millions of
> dollars….This issue arises not only with a discounted cash flow analysis, but with
> each of the other valuation techniques. This dazzling variability makes it difficult
> to rely, compare, or analyze the valuations underlying a fairness opinion unless full
> disclosure is made of the various inputs in the valuation process, the weight
> assigned for each, and the rationale underlying these choices. The substantial
> discretion and lack of guidelines and standards also makes the process vulnerable
> to manipulation to arrive at the "right" answer for fairness.  This raises a further
> dilemma in light of the conflicted nature of the investment banks who often provide
> these opinions.

*Id*. at 1577-78.

35.    Without the above-omitted information Tableau shareholders are misled as to the

reasonableness or reliability of Goldman Sachs' analyses, and unable to properly assess the

fairness of the Proposed Merger.  As such, these material omissions render the summary of the

Discounted Cash Flow Analysis included in the Recommendation Statement misleading.

36.    Additionally, with respect to Goldman Sachs *Public Comparables Analysis*, the

Recommendation Statement fails to disclose the individual multiples for each company utilized

in the analysis. A fair summary of a comparable companies or transactions analysis requires the

disclosure of the individual multiples for each company—as clearly demonstrated in summary of

the similar *Precedent Transactions Analysis* directly preceding the companies analysis. Merely

providing the median that a banker applied is insufficient, as shareholders are unable to assess

whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples

in order to present the Merger Consideration in the most favorable light. Accordingly, the omission of this material information renders the summary of this analysis provided in the Recommendation Statement misleading.

37.     Similarly, the Recommendation Statement purports to summarize the *Precedent Premium Analysis* performed by Goldman Sachs without identifying the individual transactions or premiums. For the same reasons as stated in connection with the companies analysis, shareholders are unable to assess whether the banker selected appropriate premiums, or, instead, applied unreasonably low premiums in order to present the Merger Consideration in the most favorable light. Accordingly, the omission of this material information renders the summary of this analysis provided in the Recommendation Statement misleading.

38.     In sum, the omission and/or misstatement of the above-referenced information renders statements in the Recommendation Statement materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the expiration of the Tender Offer, Plaintiff and other Tableau shareholders will be unable to make a fully-informed decision regarding whether to tender their shares, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violation of Section 14(e) of the Exchange Act)

39.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not

misleading…" 15 U.S.C. §78n(e).

41.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer.  Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

42.     The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Tender Offer and the intrinsic value of the Company.

43.     In doing so, Defendants made untrue statements and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

44.     The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable shareholders would consider them important in deciding whether to tender their shares.  In addition, a reasonable investor would view the

information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

45.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Merger, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

46.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of her entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## COUNT II

### (Against all Defendants for Violations of Section 14(d) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)

47.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting shareholder support of the Proposed Merger.

49.     Section 14(d) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.   Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security
> to accept or reject a tender offer or request or invitation for tenders
> shall be made in accordance with such rules and regulations as the

> Commission may prescribe as necessary or appropriate in the public
> interest or for the protection of investors.

50.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the

Exchange Act, provides that:

> Information required in solicitation or recommendation. Any
> solicitation or recommendation to holders of a class of securities
> referred to in section 14(d)(1) of the Act with respect to a tender
> offer for such securities shall include the name of the person making
> such solicitation or recommendation and the information required
> by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair
> and adequate summary thereof.

51.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's

directors to:

> Furnish such additional information, if any, as may be necessary to
> make the required statements, in light of the circumstances under
> which they are made, not materially misleading.

52.     The omission of information from a recommendation statement will violate

Section 14(d) and Rule 14d-9 if other SEC regulations specifically require disclosure of the

omitted information.

53.     The Recommendation Statement violates Section 14(d) and Rule 14d-9 because it

omits material facts, including those set forth above, that render the Recommendation Statement

misleadingly incomplete.  Defendants knowingly or with deliberate recklessness omitted the

material information identified above from the Recommendation Statement, causing certain

statements therein to be materially incomplete and therefore misleading.  Indeed, while

Defendants undoubtedly had access to and/or reviewed the omitted material information in

connection with approving the Proposed Merger, they allowed it to be omitted from the

Recommendation Statement, rendering certain portions of the Recommendation Statement

materially incomplete and therefore misleading.

54.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of her right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## COUNT III

**(Against all Defendants for Violations of Section 20(a) of the Exchange Act)**

55.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56.     The Individual Defendants acted as controlling persons of Tableau within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Tableau, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

57.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Recommendation Statement contains the

unanimous recommendation of each of the Individual Defendants to approve the Tender Offer. They were thus directly involved in preparing the Recommendation Statement.

59.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered, yet omits self-identified material information therein.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

60.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

61.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d) and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

62.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Merger,

until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

      B.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages

      C.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

      D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      E.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: July 11, 2019                        **MONTEVERDE & ASSOCIATES PC**

                                 By: *_/s/ Juan E. Monteverde_____*
                                  Juan E. Monteverde (JM-8169)
                                  The Empire State Building
                                  350 Fifth Avenue, Suite 4405
                                  New York, NY 10118
                                  Tel: (212) 971-1341
                                  Fax: (212) 202-7880
                                  Email: jmonteverde@monteverdelaw.com

                                  *Attorneys for Plaintiff*